THE ATLANTIC CITY.

(District Court, D. Maryland. January 30, 1914.)

SHIPPING (§ 84*)—LIABILITY OF VESSEL FOR INJURY TO STEVEDORE—DEFECTIVE APPLIANCE.

Libelant, while working as a longshoreman in unloading a vessel, was injured by the breaking of a rope sling used to hoist bags of nitrate from the hold, which caused the load to fall on libelant. The sling was furnished by the ship, and the evidence tended to show that the rope was new and of sufficient size and strength, if sound, but, when produced in court by respondent, there was an obvious defect near where it broke, and there was no evidence that it had been inspected or that it was not defective at the place where it broke. Held that, in the absence of such evidence, the ship was liable for the injury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349–351; Dec. Dig. § 84.*]

In Admiralty. Suit by William L. Evans against the steamship Atlantic City. Decree for libelant.

Arthur D. Foster and Daniel B. Chambers, both of Baltimore, Md., for libelant.

Harry N. Abercrombie and Jacob France, both of Baltimore, Md., for respondent.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ROSE, District Judge. While the libelant was employed as long-shoreman, he received the injuries for which in this case he sues. He was helping to unload a cargo of nitrate. He was working in the hold. The nitrate was in bags. Each bag and its contents weighed about 200 pounds. The longshoremen placed eight of these bags on a rope sling spread out on the floor of the hold under the hatch. The rope ends of the slings were then hooked over the falls. At a signal the sling and its contents were hoisted by steam power controlled by the winchman. There is no dispute as to the immediate cause of the accident. A rope of the sling broke while a load was going up. It and the eight bags in it fell on the libelant. The sling was furnished by the ship. The unloading of the nitrate had begun about 1 p. m. on the day preceding the accident. The libelant and the gang to which he belonged were on that day, which was April 18th, working in No. 4 hatch. On the morning of the 19th they were transferred to the bunker hatch. A number of them have been examined as witnesses for the libelant. They agree that they took with them to the bunker hatch the same slings which they had been using at No. 4. These slings appeared to them to have been new when, on the 18th, they were first put in use. They all thought that the rope of which the slings were made was smaller than those who had had previous experience in such work thought was usual.

The libelant himself had never been employed where slings were used. Although a man of mature years, he had worked as a stevedore for only six months. It so happened that he had always previously been employed in vessels and on cargoes in which another method of discharge had been used. The mate of the ship had been examined by deposition. He had testified that, when the longshoremen's gang had moved to the bunker hatch, he had been asked for more slings. He at once ordered new rope. When it arrived, the boatswain made the needed slings. They were put in use at 9 o'clock of the morning of the accident. It happened about ten minutes before noon. If he was accurate in this respect, the sling which broke had been in use about three hours. Immediately after the accident, according to his account, he went down into the hold. The stevedores said he did not go but sent a sailor. In any event, the sling at once was taken into his possession. What he identified as this sling was produced in court. Libelant's witnesses all say that it was made of larger rope than the one which was actually used and which in fact broke. Most of them seem to think that the difference in size was not great. The witnesses for the ship prove that it was usual to use for the purpose either 2¾ or 3 inch rope; that such rope was strong enough to hoist with safety several times as much weight as was put on the sling in question. The sling produced by the mate was of 3-inch rope. On the 18th of April the ship had bought a quantity of such rope. Upon its production in court it appeared that the rope in the sling which the mate said was the one which broke had, at a point some 18 inches or 2 feet from that at which it had broken, another visible defect in it. The ship's husband was himself the experienced officer of a stevedoring company. He thought the defect looked as if it had been in the rope since it was made. The foreman of stevedores, also a witness for the ship, thought

it might have been caused by use. He, however, thought that to cause it would have required longer use than the mate said the rope had had. Other witnesses for the ship were of the opinion that the defect might conceivably have been caused by particular kinds of hard usage if the rope had been subject to such usage. There was no evidence that it had been. There was no testimony that the rope, before being put in use, had been inspected. The boatswain who had made up the slings was not produced as a witness. The ship had furnished the rope. If it was defective, the ship was liable unless the defect was latent and not discoverable on reasonable inspection. If it had been free from patent defect, it would have been easy for the ship to prove it. At the close of the testimony, I intimated an opinion to that effect. The advocates for the ship asked for an adjournment to the end that they might endeavor to locate the boatswain and put him on the stand. The accident had taken place more than nine months before. Where he was at the time of the trial was not stated, and doubtless was not at the moment known to the ship's proctors. Nothing was said as to how long it would take to get him. Moreover, the issue had become too important and his recollection of the circumstances in all probability too vague to make a statement from him on the subject now of much value. I declined, therefore, to postpone the case for the purpose of hunting him up. On request of the ship's proctors I did grant a two days' postponement for the purpose of having the plaintiff examined by a medical man of their selection; the libelant having already offered at the trial his own medical testimony. At the examination of the surgeon produced by the ship, its proctors requested a further postponement to permit them to have the rope examined by experts in order that they might take their testimony as to the probable cause of the defect in it. They had had the rope in their possession or under their control ever since the accident. The question whether the rope was in proper condition when furnished was always a vital issue in the case. It did not seem reasonable or fair to the libelant to further postpone the trial for this purpose.

If the libelant's witnesses are right that an unusually small rope was used, that circumstance would have explained the accident and would have made the ship liable. I think they probably are wrong and that the rope produced by the mate was that actually used. It ought not to have broken if it had been well made, and, according to all the defendant's witnesses, could not. As produced in court, it appeared to be defective. This defect would have been obvious to any one who had made such an inspection of the rope, as the ship was bound to make before putting it in use. It must therefore be held liable.

Libelant says he is about 42 or 45. He appears to be older. His leg was broken at a point near the knee joint. A piece of the broken bone has never reunited itself. His leg has been shortened by an inch. He can use it, but it is very doubtful whether he will ever be able to do any hard manual labor again.

I think an allowance of $2,500 should be made.